UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

CHAZ GLYNN,                           :

                  Petitioner,         :     12 Civ. 4571 (JSR)(HBP)
                                            06 Cr.   580 (JSR)
     -against-                        :
                                            REPORT AND
UNITED STATES OF AMERICA,             :     RECOMMENDATION

                  Respondent.         :

----------------------------------X


          PITMAN, United States Magistrate Judge:


          TO THE HONORABLE JED S. RAKOFF, United States District

Judge:


I.   Introduction


          Pro se petitioner Chaz Glynn moves pursuant to 28

U.S.C. § 2255 to vacate, set aside or correct the sentence

imposed on him by your Honor in the criminal case bearing Docket

No. 06 Cr. 580 (JSR).

          Petitioner was convicted after trial of murder in aid

of racketeering, murder in furtherance of a drug trafficking

offense and the use of a firearm in furtherance of a crime of

violence and a drug-trafficking offense that caused the death of

another person, in violation of 18 U.S.C. § 1959(a)(1), 21 U.S.C.

§ 848(e)(1)(A) and 18 U.S.C. § 924(j), respectively.  Petitioner

was sentenced to life imprisonment on the murder-in-aid-of-racketeering count and concurrent terms totaling 41 years' imprisonment on the remaining two counts; he is currently serving his sentence.

Petitioner claims that he received ineffective assistance of counsel in connection with his decision to reject a plea agreement offered by the government and in connection with his subsequent trial. Specifically, petitioner claims that his counsel failed to prepare him to testify, failed to investigate and discover facts that would have contradicted the testimony of Freddie Robinson, one of the witnesses who implicated petitioner in the murder, and failed to investigate and call witnesses who, according to petitioner, would have provided an alibi. Finally, petitioner requests an evidentiary hearing and appointment of counsel in connection with his claims. The Government opposes the petition on the merits.

For the reasons set forth below, I respectfully recommend that the motion to vacate the sentence be denied, that the motions for an evidentiary hearing and appointment of counsel also be denied and that the petition be dismissed.

II.   <u>Facts</u>

   A.   Petitioner's
        <u>Underlying Offenses</u>[1]

      The evidence offered at trial established the following
facts.

      Petitioner was a member of and occupied a leadership
role in a gang know as the "Clay Avenue Bloods;" the gang partic-
ipated in a narcotics conspiracy and related crimes in the Bronx,
New York.

      Keith Valentine was an associate of petitioner but was
not a member of his gang.  Valentine sold wholesale amounts of
crack and powder cocaine to dealers, including an individual
named Charles Myers who resided in Virginia.

      In late 1999, Myers arranged to purchase three kilo-
grams of cocaine from Valentine for approximately $70,000.  As
was the custom between Myers and Valentine, Myers drove to the
Bronx, provided Valentine with the money and waited in his car
for Valentine to return with the cocaine.  After that transaction

------------------------------------------------------------

[1]Because the facts concerning petitioner's crimes are not
directly relevant to petitioner's claims, I summarize them here
only to the extent necessary to provide an overview of
petitioner's offenses and sufficient background to understand
petitioner's claims.  The statement of facts set forth herein is
not intended to describe all the details or nuances of the
evidence offered against petitioner.

had concluded, Myers discovered that the amount of cocaine
Valentine had delivered was one-half kilogram short.  Valentine
told Myers that Myers would have to purchase additional cocaine
for the shortage to be made up.  Myers acquiesced to Valentine's
request and, on May 22, 2000, Myers again drove to the Bronx from
Virginia to purchase an additional $20,000 worth of cocaine.  On
this occasion, Myers was accompanied by an individual named
Frederick Fowler.  After arriving in the Bronx, Myers delivered
the $20,000 to Valentine and waited in his car with Fowler for
Valentine to return with the cocaine.

Unbeknownst to Myers, Valentine had previously agreed
with petitioner to keep Myers' $20,000 and not deliver any
cocaine.  Valentine had informed petitioner that they would need
to murder Myers in order for the theft to succeed because Myers
knew where petitioner lived.  Petitioner recruited two of his
subordinates in the Bloods gang -- Edwin Kline and Freddie
Robinson -- to carry out the murder.

Kline and Robinson were the only witnesses at trial who
implicated petitioner in the murder, and both testified pursuant
to cooperation agreements with the government.  Although there
were some inconsistencies in their testimony, their testimony
supports the following facts.  On the morning of the murder,
Kline and Robinson were selling crack cocaine on Clay Avenue in

4

the Bronx (Tr.[2] 341).  Petitioner approached them and told them
he had some "work" for them to do; petitioner took the two to his
apartment and gave each a pistol (Tr. 341-42).  Petitioner told
Kline and Robinson that they had to kill two men and to "make
sure that [they] had killed them both" because the intended
victims knew where Valentine lived (Tr. 605).  As a member of the
Bloods who was subordinate to petitioner, Robinson testified he
felt compelled to follow petitioner's instructions, stating that
in the Bloods "nobody don't hold a gun to your head and nobody
don't actually say you better do it.  It's either you do or you
don't, and then you get dealt with or see if you do it" (Tr.
362).

> Kline testified that petitioner told them that commis-
sion of the murder would elevate their status in the Bloods:

>> after we did this, as far as robbing these guys and
>> killing them or anything like that, we'd be able to
>> come up as far as our rank at the time, because [peti-
>> tioner] was trying to bring his own [unit in the
>> Bloods] together so he was telling me and [Robinson]
>> the whole time that if we put that work in, we would
>> all get power from that now.  We'd get power respect
>> from all other homeys and everything like that and we'd
>> be able to move on.

---

[2]"Tr." refers to the transcript of petitioner's second
trial.  "S.Tr." refers to the transcript of petitioner's
sentencing.

(Tr. 607).  Kline understood that committing the murder would
enhance his position in the Bloods because he would "g[e]t money
from doing it, everything would all fall in place, as far as us
now having more money in order to get more guns, in order to get
more drugs, and that would make us all stronger" (Tr. 608).

Petitioner, Kline and Robinson left petitioner's
apartment; petitioner subsequently pointed out the car in which
Myers and Fowler were sitting (Tr. 345-46).  Petitioner knew how
Myers and Fowler were situated in the car, because he told Kline
and Robinson that one should shoot into the front of the car
while the other shot into the back (Tr. 346, 361).  Later that
day, Kline and Robinson approached the car in which Myers and
Fowler were sitting (Tr. 347-48, 610); Myers was seated in the
front of the car, Fowler was seated in the rear (Tr. 76).  They
initially walked past the car and then turned around and walked
past it a second time (Tr. 348).  Robinson took out his gun and
started firing at Fowler in the rear of the car (Tr. 347-48,
615).  Kline pulled out his gun, but did not fire (Tr. 615).
After the shooting, Kline and Robinson ran toward Clay Avenue and
returned to petitioner's apartment (Tr. 351).

Back at petitioner's apartment, Robinson told peti-
tioner that he and Kline had shot the two men (Tr. 351-52).
Petitioner then told Valentine, who was also present in peti-

6

tioner's apartment, that "I told you my little homeys put in work, I told you they put in work" (Tr. 352).  Petitioner told Kline and Robinson that the bag of cash Valentine had gotten from Myers contained $10,000.  Petitioner gave $3,500 to each of Kline and Robinson and told them that he and Valentine would divide the balance (Tr. 353).  Petitioner let Robinson keep the gun that he had used to shoot Fowler (Tr. 354).

Meanwhile, Myers, who had not been injured in the shooting, drove in search of a hospital (Tr. 79-80).  He ultimately drove to a police station from which Fowler was taken to a hospital where he was pronounced dead (Tr. 80).

B.  Procedural History

Petitioner was initially tried in June and July 2008. Prior to that trial, his counsel made a number of motions, seeking dismissal of count one of the indictment (Docket Item ("D.I.") 91 in 06 Cr. 580), to exclude evidence of petitioner's gang membership and other bad acts (D.I. 96 in 06 Cr. 580), to exclude expert medical and ballistic evidence (D.I. 99 in 06 Cr. 580), to compel discovery concerning Freddie Robinson, one of the principal witnesses against petitioner (D.I. 102 in 06 Cr. 580), to strike surplusage from the indictment (D.I. 104 in 06 Cr. 580), to preclude evidence of statements petitioner made during

proffer sessions (D.I. 113 in 06 Cr. 580) and to preclude evidence of petitioner's prison calls and other evidence (D.I. 120 in 06 Cr. 580).  Also prior to the first trial, the government offered to accept a plea to one count of 21 U.S.C. § 848(e) (causing a death in furtherance of a continuing criminal enterprise) with a non-binding stipulated sentencing range of 292 to 365 months and a mandatory minimum sentence of 20 years (Petition, dated May 31, 2012, (D.I. 1 in 12 Civ. 4571) ("Petition"), Ex. A[3]).  Petitioner rejected the government's offer.

The first trial ended in a mistrial when the jury was unable to agree on a unanimous verdict.

Petitioner was retried in September and October 2008. The government made a revised plea offer before the second trial, this time offering to accept a plea to one count of violating 18 U.S.C. § 924(j) (causing a death with a firearm during a drug trafficking crime or a crime of violence) (Declaration of David A. Ruhnke, Esq., dated Sept. 9, 2013 (D.I. 221 in 06 Cr. 580) ("Ruhnke Decl.") ¶ 6).  A plea to this offense would not have required a minimum sentence.  Prior to the retrial, defense

---

[3]Because the Petition is not serially paginated, where pages in the Petition are cited herein, I use the page numbers assigned by the Court's ECF system.

counsel moved to preclude more than 50 government exhibits on the
ground of relevance (D.I. 142 in 06 Cr. 480).

     After the jury's guilty verdict, petitioner's counsel
submitted a 29-page affirmation and memorandum of law in connec-
tion with sentencing that set forth petitioner's personal history
and the legal reasons why your Honor should refrain from imposing
a life sentence.  Prior to sentencing, petitioner also submitted
his own letter directly to your Honor.[4]  After recounting a
number of inconsistencies among the witnesses' testimony, peti-
tioner described the events on the day of the robbery and clearly
indicated that he was in his apartment immediately before and
after the robbery and had contact with Valentine, Kline and
Robinson immediately before and after the robbery:

          I see Keith [Valentine] talking to Robinson &
     Kli[ne] on the corner.  Like really talking to them,
     getting into it, so I figure something is up[.]  I go
     over there[,] they talking about robbing someone be-
     cause [B]am[5] asks how much money and Keith [Valentine]
     says a lot[.]  At this time I leave[.]  I didn't care
     for robbing no one[;] I was hustling doing OK.

          A little later Robinson & Kli[ne] come down to my
     building[.]  They are asking me to hold a gun[.]  I
     tell them I[']m, not fucking wit them [as] far as
     lending them a gun so they are upset with me, I[']m
     like laughing at them, they walk off and come back

---

     [4]This letter is dated January 4, 2009.  It is not currently
part of the record, but a copy will be docketed contemporaneously
with the filing of this Report and Recommendation.

     [5]Bam was one of the nicknames Robinson used (Tr. 184).

maybe 1/2 hour[,] 45 min[.]  I[']m in the lobby[,] they
flash 2 gun[s] on me[,] smiling like yea we on the
paper chase[.]  I[']m laughing[,] I tell them I keep
that 9 mm.  Robinson says I got my old trustie back[,]
talking about a 45 that S. Hood always lends him[.]  We
was smoking at the time but I leave I go to Tokeys
house[.]  T. Money is their [sic][.]  Me and him go to
my 5th floor (apt) we[']re listening to music[,] talk-
ing about partying that night[,] what we gonna wear[,]
what club[,] stuff like that[.]  A while later Keith
[Valentine] knocks on my door[,] he had a brown bag in
his hand[.]  We get to my room [,] he throws the money
on my bed[,] me and T. Money looking[,] I[']m like
dam[.]  Keith [Valentine] is like yea I[']m like who
you c[a]ught (robbed)[.]  He says these OT niggas[.]  T
Money takes a stack[,] put it in his pocket but looking
at Keith [Valentine.]  He like go ahead then throws me
a stack and says put another stack away for him.  So
I[']m like what up[.]  He says I[']m waiting for Freddy
& Eddie[.]  Now I[']m clear this is the robbery they
was talking about earl[i]er.

     So he's counting the money on my bed[.]  At that
same time Robinson & Kl[ine] knock on my room door[.]
I open it[,] they looking crazy in the face so I[']m
thinking they robbed something and we up here playing
in the money[.]  They probably think we stashing[.]  So
Keith [Valentine] is asking what happen[e]d[,] what
happen[e]d[.]  Kli[ne] says we put that in so I[']m
like on who[,] he like on Keith OT peoples[.]  So I[']m
like[,] you hit em up[?]  Kli[ne] says yea[,] Bam says
I hit the whole car up[.]  So I ask where at[?]  He
says up the block[.]  I go look out my window looking
up the block[.]  I don[']t see anything but every body
on the block looking at my window[.]  So now I[']m
upset feeling like they shot some dudes and ran to my
house making my mother house all hot[.]  So I[']m
telling everyone we leaving[.]  Robinson wants to leave
his gun at my house[.]  I tell him Hell No[.]  We leave
they split[t]ing they money up in the hall way.  T
Money is still asking all of them for money smiling at
me like free money[.]  Robinson gives T Money more
money[.]  I[']m stilled pissed off at the situation.
We go up the block into 1140[.]  We go to Robinson's
family[']s house[.]  Her name is Chavon[.]

Me and Kli[ne] had girl friends up the[re] so we
are all up their chilling, smoking and drinking[.]
After a while we leave[,] go back down stairs[.]
Sherry and Stacey are down stairs and a couple of our
other friends[.]  We all wind up going to a hotel
uptown[.]  Eddie did not go.

I read in a law book that you can submit your
alib[i][.]  My lawyers said I can[']t because they not
saying I was their but that is what Robinson says we
all go up the block together[.]

I think the jury should have heard my alib[i][.]

Although counsel's efforts to avoid conviction and a
life sentence were ultimately unsuccessful, your Honor repeatedly
and effusively praised petitioner's counsel's performance, both
during the trial and at sentencing.  Your Honor made the follow-
ing comments, among others:

- The record should reflect, as I am sure you well
  know, I feel blessed that I have such terrific
  counsel on both sides in this case (Tr. 303).

- Let me take this opportunity once again to express
  to counsel my very great thanks.  I can't say I
  want to have this trial go through a third time.
  Two is quite sufficient.  But I will say that I've
  rarely had counsel who have been more
  professional, more expert than in this case.  I'm
  very grateful to all counsel (Tr. 961).

- Defense counsel has submitted an excellent . . .
  memo of law [concerning sentencing] (S.Tr. 4).

- But I think, Mr. Glynn, you need to realize and I
  think part of you does realize, you probably got
  two of the best lawyers in the United States.  You
  couldn't have had a better defense than you had
  here.  In hindsight one can always say, [w]ell,

11

maybe that could have been done, this could have
been done.  That is what they call Monday morning
quarterbacking.  But I assure you had a Rolls-
Royce defense in this case (S.Tr. 18).

Petitioner appealed his conviction to the Court of
Appeals for the Second Circuit arguing that evidence of peti-
tioner's gang activity was improperly admitted and that the
sentence violated the Eight Amendment.  The Court of Appeals
rejected these arguments and affirmed petitioner's conviction and
sentence.  United States v. Byrd, 379 F. App'x 84 (2d Cir. 2010)
(summary order).  The United States Supreme Court denied peti-
tioner's application for a writ of certiorari.  Glynn v. United
States, --- U.S. ---, 131 S.Ct. 2960 (2011).

III.  Analysis

   A.  Applicable Standards

      1.  Petitions Under
          28 U.S.C. § 2255

A prisoner in federal custody may move to vacate, set
aside or correct his sentence only "upon the ground that the
sentence was imposed in violation of the Constitution or laws of
the United States, or that the court was without jurisdiction to
impose such a sentence, or that the sentence was in excess of the
maximum authorized by law, or is otherwise subject to collateral

12

attack."  28 U.S.C. § 2255(a).  "Because collateral challenges
are in tension with society's strong interest in the finality of
criminal convictions, the courts have established rules that make
it more difficult for a defendant to upset a conviction by
collateral, as opposed to direct, attack."  Mui v. United States,
614 F.3d 50, 53 (2d Cir. 2010) (internal quotation marks omit-
ted).  To succeed on a collateral attack on a final judgment
under Section 2255, petitioner must demonstrate either the
existence of a "constitutional error . . . or an error of law or
fact that constitutes a fundamental defect which inherently
results in a complete miscarriage of justice."  United States v.
Bokun, 73 F.3d 8, 12 (2d Cir. 1995) (internal quotation marks
omitted); accord Sanders v. United States, 1 F. App'x 57, 58 (2d
Cir. 2001) (summary order); Cuoco v. United States, 208 F.3d 27,
30 (2d Cir. 2000); Graziano v. United States, 83 F.3d 587, 590
(2d Cir. 1996) (per curiam); Rodriguez v. United States, 11 Civ.
2957 (TPG), 2013 WL 6171618 at *1 (S.D.N.Y. Nov. 25, 2013)
(Griesa, D.J.).

                2.  Evidentiary Hearings
                    in Connection with
                    a Section 2255 Petition

        Although 28 U.S.C. § 2255(b) directs a district court
to conduct a "hearing" unless the record "conclusively show[s]

13

that the prisoner is entitled to no relief," it is well settled
that a live, testimonial hearing is not required in all cases.
Section 2255 "does not strip the district courts of all discre-
tion to exercise their common sense" in determining whether a
such a hearing is necessary.  Machibroda v. United States, 368
U.S. 487, 495 (1962).

> In Chang v. United States, 250 F.3d 79 (2d Cir. 2001),
> the Second Circuit held that the reference in the
> statute to notice given to "the United States attorney"
> only -- that is, without mentioning the petitioner --
> reflects that "'there are times when allegations of
> facts outside the record can be fully investigated
> without requiring the personal presence of the pris-
> oner.'"  Id. at 85 (quoting Machibroda v. United
> States, 368 U.S. 487, 495 (1962)); see 28 U.S.C. §
> 2255[(c)] ("A court may entertain and determine such
> motion without requiring the production of the prisoner
> at the hearing.").  Thus, Chang held that, depending on
> the allegations in the petition, a "court may use
> methods under [§] 2255 to expand the record without
> conducting a full-blown testimonial hearing." Chang,
> 250 F.3d at 86 (citing Blackledge v. Allison, 431 U.S.
> 63, 81-82 (1977)).  Potential methods available to a
> court to supplement the record include "'letters,
> documentary evidence, and, in an appropriate case, even
> affidavits.'"  Id. (quoting Raines v. United States,
> 423 F.2d 526, 529-30 (4th Cir. 1970)).

Riggi v. United States, 04 Civ. 7852 (JSR), 2007 WL 2245596 at *7
(S.D.N.Y. Aug. 6, 2007) (Rakoff, D.J., adopting the Report &
Recommendation of Gorenstein, M.J.); accord Foster v. United
States, 581 F. App'x 105, 106 (2d Cir. 2014) (summary order)
(affirming dismissal of Section 2255 petition without a live
hearing where such a hearing "would [have been] little more than

14

a 'swearing match' and [would have added] little or nothing to
the affidavits"); Ferranti v. United States, 480 F. App'x 634,
638 (2d Cir. 2012) (summary order) ("Although [o]ur precedent
disapproves of summary dismissal of petitions where factual
issues exist[], . . . it permits a 'middle road' of deciding
disputed facts on the basis of written submissions." (quotation
marks omitted, alterations in original)); Wang v. United States,
458 F. App'x 44, 45 (2d Cir. 2012) (summary order) (affirming
dismissal of Section 2255 petition where "the District Court did
conduct an evidentiary hearing, albeit one limited to the sworn,
written submissions of [petitioner], his former counsel, and the
interpreters"); Puglisi v. United States, 586 F.3d 209, 214 (2d
Cir. 2009) ("[W]hen the judge that tried the underlying proceed-
ings also presides over the Section 2255 motion, a less-than
full-fledged evidentiary hearing may permissibly dispose of
claims where the credibility assessment would inevitably be
adverse to the petitioner."); Chang v. United States, 250 F.3d
79, 85 (2d Cir. 2001) ("[A]lthough a hearing may be warranted,
that conclusion does not imply that a movant must always be
allowed to appear in a district court for a full hearing if the
record does not conclusively and expressly belie his claim, no
matter how vague, conclusory or palpably incredible his allega-
tions may be." (internal quotation marks omitted)); United States

15

v. Noorzai, 953 F. Supp. 2d 499, 506 (S.D.N.Y. 2013) (Chin, Cir. J., sitting by designation) ("The court, however, has a wide variety of tools available to it in developing the record during habeas proceedings and may use its discretion to determine the scope and nature of a hearing." (internal quotation marks & citations omitted)); Rosario-Dominquez v. United States, 353 F. Supp. 2d 500, 507-08 (S.D.N.Y. 2005) (Rakoff, D.J., adopting the Report & Recommendation of Gorenstein, M.J.).

       Petitioner's trial was not conducted in front of me, and I do not have the direct knowledge of the trial proceedings that some of the judges in the cases cited above had.  That fact does not, however, distinguish the foregoing cases.  I have studied the extensive record of petitioner's trial, have reviewed the relevant portions of the transcript and have received affirmations from petitioner and detailed affirmations from each of the two attorneys who represented petitioner at trial.  In addition, this Report and Recommendation will be reviewed de novo by your Honor who did conduct petitioner's trial and does have the first-hand knowledge to which the Court of Appeals referred in Puglisi v. United States, supra, 586 F.3d at 215.  In light of the record before me and the de novo review by your Honor, I conclude that the issues raised by petitioner can be resolved on the basis of the parties' written submissions.

3.   Standards for Ineffective-
     <u>Assistance-of-Counsel Claims</u>

In order to prevail on an ineffective-assistance-of-counsel claim, a habeas petitioner must meet the now-familiar, two-part test set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 686–87 (1984).

> The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.
>
>                    *      *      *
>
> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

<u>Accord</u> <u>Greiner v. Wells</u>, 417 F.3d 305, 319 (2d Cir. 2005); <u>Aeid v. Bennett</u>, 296 F.3d 58, 62 (2d Cir. 2002); <u>Hernandez v. United States</u>, 202 F.3d 486, 488 (2d Cir. 2000); <u>Hurel Guerrero v. United States</u>, 186 F.3d 275, 281 (2d Cir. 1999); <u>McKee v. United</u>

States, 167 F.3d 103, 106 (2d Cir. 1999); Jackson v. Leonardo, 162 F.3d 81, 85 (2d Cir. 1998).

In determining whether counsel's performance was objectively deficient, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland v. Washington, supra, 466 U.S. at 689 (internal quotation marks omitted).

With respect to the second element -- prejudice -- petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, supra, 466 U.S. at 694.

Because the test is conjunctive, a habeas petitioner's failure to satisfy either prong requires that the challenge to the conviction be rejected.  See Strickland v. Washington, supra, 466 U.S. at 697; Bennett v. United States, 663 F.3d 71, 85 (2d Cir. 2011).

B.   Application of the
     Foregoing Principle
     to Petitioner's Claims

     1.   The Rejected
          Plea Offer

     Petitioner first claims that counsel provided ineffec-

tive assistance with respect to the government's offer of a plea

to one count of violating 18 U.S.C. § 924(j) which carried a

maximum sentence of life, but did not have a mandatory minimum.

     Specifically, petitioner claims that

     Although counsel advised petitioner of the government's
     offer, he failed to give petitioner any advice or
     suggestion on how to deal with the proffered plea
     bargain.  Counsel did not attempt to persuade peti-
     tioner that it was in his best interest to accept the
     plea bargain.  Furthermore, after petitioner received a
     hung jury in the first trial, counsel felt more confi-
     dent that he could beat the case and failed to even
     attempt to consult with petitioner regarding the plea
     bargain or advise him to accept it.  If counsel would
     have advised petitioner that it was in his best inter-
     est to accept the government's offer, petitioner would
     have entered a guilty plea. . . .  Thus, counsel pro-
     vides ineffective assistance when he failed to give
     petitioner any advice or suggestion on how to deal with
     the proffered plea bargain.

(Petition at 25; see also Petition at 48).

     In response, the government offers affirmations from

the two attorneys who represented petitioner at both trials.

They each deny petitioner's allegations and state that they did

19

explain the plea to petitioner and urged him to take it.

Michael A. Young, Esq., states:

> As a result of the previous mistrial, defense
> counsel had a full opportunity to review the govern-
> ment's evidence.  We had also learned through inter-
> views with some of the jurors immediately after the
> mistrial was declared in the first trial that their
> vote had been eleven to one for conviction.  It was
> therefore clear to us that the government's evidence
> had been sufficient to convince all but one of the
> jurors that Mr. Glynn was guilty beyond a reasonable
> doubt.  We discussed these circumstances in some detail
> with Mr. Glynn and told him that it was our profes-
> sional opinion, based on everything that we knew about
> the case, that he was very likely to be convicted if he
> went to trial a second time and that he should there-
> fore accept the government's offer.

(Affirmation of Michael A. Young, Esq., dated Sept. 8, 2013,

(D.I. 223 in 06 Cr. 580) ("Young Aff.") at 2).

Similarly, petitioner's co-counsel, David A. Ruhnke,

Esq., has submitted a declaration in which he states that he

discussed the government's plea offer with petitioner before the

first trial and advised petitioner that if he accepted the offer,

his best case outcome was a sentence within the "20-year range."

Like Mr. Young, Mr. Ruhnke recalls that the jury in the first

trial came within one vote of convicting and that counsel renewed

their discussions with petitioner about the government's plea

offer at that time.  Mr. Ruhnke states:

> 6.  After the jury came within one vote of con-
> victing Mr. Glynn of, among other matters, a count of
> the indictment that carried a mandatory life sentence,

20

Mr. Young and I were concerned that, having given it
our best efforts, there was a serious risk that Mr.
Glynn would be convicted the second time around.  Mr.
Young and I both urged Mr. Glynn to accept a revised
plea offer that would have him plead guilty to a viola-
tion of 18 U.S.C. § 924(j).  The difference between the
first plea offer and the revised offer was that the
924(j) count carried no mandatory minimum, while the §
848(e)(1)(A) carried a mandatory minimum of 20 years.

7.  My notes reflect a discussion with Mr. Glynn
on July 17, 2008 -- 10 days after the conclusion of the
first trial -- where he stated he would always be open
to a plea offer but that he wanted to fight his case
and that he didn't want to engage in "negative think-
ing," a reference to discussions about the likelihood
of his being convicted the second time.  My notes
reflect a further discussion of the proposed plea on
July 30, 2008 and that Mr. Glynn still wanted to go to
trial.  Finally, my notes reflect a discussion with Mr.
Glynn on September 24, 2008, several days before the
second trial was to begin, during which we calculated
potential Guidelines sentences, the most optimistic of
which had Mr. Glynn serving another 10-12 years.  My
notes of that conversation further reflect that Mr.
Glynn had prepared a sheet of paper listing the pros
and cons of a plea versus a trial.  Mr. Glynn's deci-
sion was to go to trial.  While these are the only
specific references in my notes to the desireability of
accepting the plea offer, I am confident that there
were additional discussions of the topic in the 11
weeks between the trials.  Both Mr. Young and I thought
the plea offer was a reasonable one and recommended to
Mr. Glynn that he accept the offer.

(Ruhnke Decl. ¶¶ 6-7).

Several other aspects of the record bear on this issue.

As noted above, prior to his sentencing, petitioner submitted a

lengthy letter to your Honor.  In that letter, petitioner de-

scribed the testimony that he believed was untrue, denied that he

provided any guns to Kline and Robinson and described his per-
sonal tribulations.  However, he makes no claim in that letter
that he would have accepted the government's plea offer had he
been counseled by his lawyers to do so.  When petitioner spoke at
his sentencing, he also maintained his innocence (S.Tr. at 14),
criticized his counsel for stipulating to the effect of certain
conduct on interstate commerce (S.Tr. at 14-15) and stated that
if his appeal was successful, he would testify at a retrial
(S.Tr. 18).  Again, petitioner made no reference to the govern-
ment's plea offer and made no claim that he would have accepted
the offer had his attorneys spent more time discussing it with
him.

     Initially, I conclude that this aspect of the petition
can be resolved on the record before me without an in-court
hearing.  Petitioner's claim here should be viewed with particu-
lar caution.  Any defendant who had passed up a plea offer to an
offense carrying a lesser sentence, went to trial and was con-
victed of a sentence carrying a far greater sentence would
necessarily claim that he would have taken the plea if only he
had gotten different advice.  In addition, given the zealousness
of counsel's representation of petitioner, as evidenced by both
the numerous pretrial motions they made and your Honor's repeated
praise of their performance, petitioner's contention that the

22

mistrial -- the product of a jury that voted 11 to 1 to convict -
- lead counsel to believe they could prevail at a retrial is not
credible.  No defense attorney is going to be encouraged by the
outcome of a trial in which his client escaped conviction by a
single vote.  The lack of any detail in petitioner's papers, in
comparison to the detail of the Ruhnke Declaration, which con-
tains the dates and nature of the plea discussions, also suggests
that petitioner's statements are not credible.  Finally, the
strong evidence that petitioner is now seeking to offer a perjur-
ious alibi defense, discussed in more detail below, also leads me
to discredit petitioner's claim.

        In Samet v. United States, 559 F. App'x 47 (2d Cir.
2014) (summary order), a Section 2255 petitioner rejected the
government's plea offer for a ten-year sentence, was found guilty
and sentenced to 327 months (27 1/4 years).  Without conducting a
testimonial hearing, the District Court rejected petitioner's
uncorroborated testimony that his counsel had failed to disclose
the government's offer.  The Court of Appeals affirmed the denial
of the petition, stating:

            We turn first to Samet's claim regarding the plea
        offer before Samet's first trial.  It is well settled
        that "failure to advise a client as to a plea offer is
        unreasonable performance."  Raysor v. United States,
        647 F.3d 491, 496 (2d Cir. 2011).  But it is equally
        well settled that district courts need not accept the
        uncorroborated statements of a criminal defendant at

face value.  <u>See</u>, <u>e</u>.<u>g</u>., <u>Purdy v. Zeldes</u>, 337 F.3d 253,
259 (2d Cir. 2003) ("[I]n most circumstances a con-
victed felon's self-serving testimony is not likely to
be credible.").  Here, we find nothing improper in the
district court's determination that Samet's statement
that [his counsel] failed to inform or advise him about
the plea offer -- the only evidence Samet proffered on
this issue -- was uncorroborated and incredible.

559 F. App'x at 49 (first alteration in original).

As in <u>Samet</u>, I do not credit petitioner's contention

that his counsel did not advise him to accept the government's

plea offer, and I credit his counsel's statements that they did

recommend that he accept the plea offer.  Thus, I find that

petitioner has failed to establish the first prong of the <u>Strick-</u>

<u>land</u> test and that his claim of ineffective assistance with

respect to plea negotiations fails.

> 2.  Failure to Prepare
>     <u>Petitioner to Testify</u>

Petitioner next claims that his counsel was ineffective

for failing to prepare him to testify and that if he had been

properly prepared, he would have testified that he was not

involved in the shooting or the robbery, that he did not receive

any money from Valentine and that he was at his brother's apart-

ment at the time of the robbery and murder.

Again, defense counsel has submitted a detailed decla-

ration in which he states he did prepare petitioner to testify.

24

         With regard to the issue of Mr. Glynn testifying,
    I can recall several conversations about the wisdom of
    that course before and during the first trial and
    before and during the second trial.  My file contains a
    typed detailed outline of a direct examination of Mr.
    Glynn and notes dated October 4, 2008, a Saturday,
    during which we spent approximately 2 1/2 hours review-
    ing his testimony in a question and answer format and
    also discussed the risks and potential benefits of
    having him testify, as we had on many prior occasions.
    As I had in the past, I advised Mr. Glynn that, in
    light of all the circumstances, including how the re-
    trial had played out, testifying was not in his best
    interest and, as he had during the first trial, he
    accepted this advice.  His decision not to testify was
    not based on any lack of preparation or discussion of
    that option.

(Ruhnke Decl. ¶ 8).

         The detail in the Ruhnke Declaration, in comparison to

petitioner's conclusory statements, lead me to credit the former

over the latter.  In addition, there is objective evidence that

circumstantially corroborates trial counsel's contention that

petitioner made an informed decision not to testify.  Petitioner

was arrested in 2001 and ultimately pleaded guilty to narcotics

and firearms charges.  United States v. Glynn, 01 Cr. 93.  Prior

to pleading guilty in that case, petitioner participated in a

proffer session with the United States Attorney's Office during

which he admitted to participating in a shooting in the summer of

2000 and to possessing multiple firearms in 2000 (see Affirmation

of Michael A. Young, dated June 19, 2008 (D.I. 114 in 06 Cr. 580)

at 1-3 & Exs).  Had petitioner testified and denied his involve-

25

ment in Fowler's death, the government could have introduced the admissions petitioner made during the course of the proffer. Petitioner's admitted involvement with and possession of firearms at the time of the shooting in issue could well have had a substantial negative impact on the jury, and this potential adverse consequence could well have caused petitioner to refrain from testifying.

Thus, I do not credit petitioner's claim that his counsel did not prepare him to testify and I find that counsel did prepare petitioner to testify and that petitioner made a counseled and informed decision not to testify.

In addition, even if petitioner had satisfied the first prong of the Strickland test, he cannot establish prejudice. Petitioner's January 4, 2009 letter to your Honor establishes that petitioner was in his apartment with Valentine, Kline and Robinson immediately before and after the shooting and that Valentine even dumped the proceeds of the robbery on petitioner's bed.  In light of these statements from petitioner, the testimony he now claims he would have given -- that he was at his brother's residence at the time of the events in issue -- would have been perjurious.  A criminal defendant's loss of the right to present false testimony -- even if that perjured testimony would probably have lead to an acquittal -- does not satisfy the prejudice prong

26

of <u>Strickland</u>.   <u>Nix v. Whiteside</u>, 475 U.S. 157, 186-87 (1986)
("To the extent that Whiteside's claim rests on the assertion
that he would have been acquitted had he been able to testify
falsely, Whiteside claims a right the law simply does not recog-
nize . . . . Since Whiteside was deprived of neither a fair trial
nor any of the specific constitutional rights designed to guaran-
tee a fair trial, he has suffered no prejudice." (Blackmun, J.,
concurring in the judgment)); <u>accord</u> <u>Williams v. Taylor</u>, 529 U.S.
362, 392 (2000) ("Even if a defendant's false testimony might
have persuaded the jury to acquit him, it is not fundamentally
unfair to conclude that he was not prejudiced by counsel's
interference with his intended perjury."); <u>LaChance v. Erickson</u>,
522 U.S. 262, 266 (1998) ("It is well established that a criminal
defendant's right to testify does not include the right to commit
perjury."); <u>United States v. Dunnigan</u>, 507 U.S. 87, 96 (1993)
("[A] defendant's right to testify does not include a right to
commit perjury."); <u>Harris v. New York</u>, 401 U.S. 222, 225 (1971)
(the privilege of testifying "cannot be construed to include the
right to commit perjury"); <u>United States v. Norman</u>, 776 F.3d 67,
77 (2d Cir. 2015); <u>see</u> <u>Lockhart v. Fretwell</u>, 506 U.S. 364, 367-71
(1993).

3.  Failure to Investigate
    and to Offer an Alibi Defense

Petitioner next contends that his trial counsel was
ineffective for failing to interview certain witnesses and for
failing to call them to testify.  Specifically, petitioner claims
that further investigation would have revealed that Robinson
possessed the murder weapon before the day of the shooting and
that he had acquired the weapon from an unidentified third party
(Petition at 29).  Petitioner also claims that counsel should
have interviewed and called, Aerion Glynn, Leilia Lythcott, John
Scott, James Wilson, Keith Valentine, Jason Riddick, and Omar
Portee (Petition at 31).  Petitioner claims that Aerion Glynn and
Lythcott, who are petitioner's brother and his brother's girl-
friend, would have testified that petitioner was at their apart-
ment at the time of the shooting (Petition at 40-41).  He claims
that Scott would have testified that Robinson possessed the
weapon before the day of the shooting and that Wilson would have
testified that he sold Robinson the murder weapon (Petition at
31).  Petitioner does not describe the testimony he believes
Valentine, Riddick and Portee would have provided.

The affidavits of petitioner's trial counsel state that
other than Valentine, petitioner never identified any of the
foregoing individuals as having exculpatory evidence or other

28

evidence that might have been helpful to the defense[6] (Young Aff. at 2-3; Ruhnke Decl. ¶ 9).  Defense counsel state that they contacted Valentine's attorney about the possibility of Valentine testifying for petitioner, but Valentine's attorney stated that Valentine had no testimony that would be helpful to the defense (Young Aff. at 3; Ruhnke Decl. ¶ 9).  Petitioner's counsel also note that petitioner's brother, Aerion Glynn, was present for several parts of the trial and that each spoke with Aerion. According to counsel, Aerion never told either of them that he or his girlfriend could provide an alibi defense for petitioner.

"To successfully assert an ineffective assistance of counsel claim based on a failure to investigate, a petitioner must do more than make vague, conclusory, or speculative claims as to what evidence could have been produced by further investigation." Medrano v. United States, 13 Civ. 1604 (LTS)(JLC), 2015 WL 848551 at *21 (S.D.N.Y. Feb. 27, 2015) (Cott, M.J.) (Report & Recommendation) (internal quotation marks omitted); accord Brancaccio v. United States, 14 Civ. 1538 (RMB), 2015 WL 4104847 at *4 (S.D.N.Y. July 2, 2015) (Berman, D.J.).  As explained in

---

[6]Valentine was a co-defendant in 06 Cr. 580.  Valentine plead guilty to violating 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 924(c)(1)(A)(i) and was sentenced to a total of 330 months.

United States v. Peterson, 896 F. Supp. 2d 305, 316-17 (S.D.N.Y.

2012) (Chin, Cir. J., sitting by designation):

> [W]here a petitioner claims that his attorney failed to
> investigate potential witnesses, "the petitioner must
> demonstrate that the witnesses would have testified at
> trial and explain the expected nature of the witnesses'
> testimony." [Taylor v. Poole, 07 Civ. 6318 (RJH)(GWG),
> 2009 WL 2634724,] at *15, 2009 U.S. Dist. LEXIS 76316,
> at *42 (S.D.N.Y. Aug. 27, 2009)] (collecting cases).
> Courts have rejected ineffective assistance claims
> based on failure to investigate potential witnesses
> where the petitioner failed to provide affidavits from
> the witnesses stating what testimony they would have
> offered.  See, e.g., Eisemann v. Herbert, 401 F.3d 102,
> 108-09 (2d Cir. 2005) (finding petitioner's assertion
> that witness would have provided exculpatory testimony
> was speculation where record contained no evidence to
> suggest that witness possessed such information);
> McCarthy v. United States, Nos. 02 Civ. 9082
> (LAK)(GWG), 98 Cr. 1469 (BDP), 2004 WL 136371, at *17,
> 2004 U.S. Dist. LEXIS 705, at *52 (S.D.N.Y. Jan. 23,
> 2004) (denying ineffective assistance claim because
> petitioner failed to produce affidavits from proposed
> witnesses showing that they would have testified at
> trial).

See also Bridges v. United States, 04 Civ. 2715 (HB), 2005 WL

1798084 at *4 (S.D.N.Y. Aug. 1, 2005) (Baer, D.J.), citing

Buitrago v. Scully, 705 F. Supp. 952, 954 (S.D.N.Y. 1989)

(Lasker, D.J.).  Finally, "[t]he decision to call or bypass

particular witnesses is peculiarly a question of trial strategy

which courts will practically never second-guess."  United States

ex rel. Walker v. Henderson, 492 F.2d 1311, 1314 (2d Cir. 1974)

(internal citations omitted), citing United States v. Matalon,

445 F.2d 1215, 1219 (2d Cir. 1971) and United States v. Garquilo, 324 F.2d 795, 797 (2d Cir. 1963).

　　　　　Even if I make the generous assumption that petitioner did identify the witnesses in issue to his trial counsel, petitioner has failed to offer any evidence that the their testimony would have been helpful to the defense, and petitioner has, therefore, failed to satisfy the prejudice prong of the Strickland test.  The only witnesses from whom petitioner has provided affidavits are Aerion Glynn and Leilia Lythcott.  The affidavits are extremely short and say nothing more than that petitioner was with Glynn and Lythcott from 2:00 p.m. on the day of the shooting until 1:00 or 2:00 a.m. the following morning (Petition at 40-41).  As discussed above, this putative alibi is contradicted by petitioner's January 4, 2009 letter to your Honor in which petitioner admits to being in his apartment at the time of the shooting, meeting with Valentine, Robinson and Kline before and after the shooting, seeing the proceeds of the robbery and receiving a portion thereof and looking out his window at the scene of the shooting immediately after it took place.  In light of the foregoing, any testimony from Aerion Glynn or Lythcott offered in support of an alibi would be perjurious.  As explained above, the loss of an opportunity to offer perjured testimony is not prejudice within the meaning of Strickland.  Williams v.

31

<u>Taylor</u>, <u>supra</u>, 529 U.S. at 392; <u>LaChance v. Erickson</u>, <u>supra</u>, 522
U.S. at 266; <u>United States v. Dunnigan</u>, <u>supra</u>, 507 U.S. at 96;
<u>Nix v. Whiteside</u>, <u>supra</u>, 475 U.S. at 175, 186-87; <u>Harris v. New
York</u>, <u>supra</u>, 401 U.S. at 225; <u>United States v. Norman</u>, <u>supra</u>, 776
F.3d at 77.  With respect to Scott and Wilson, petitioner offers
only vague and conclusory allegations that are insufficient, and
petitioner has not provided any affidavits or declarations from
Scott or Wilson.  Finally, petitioner offers no description
whatsoever of the evidence that Valentine, Riddick and Portee
could have offered.

      Thus, petitioner's claim that counsel failed to
investigate and call alibi witnesses and other defense witnesses
also fails.

              4.   Request for
                   <u>Appointment of Counsel</u>

      It is well settled that there is no constitutional
right to counsel in connection with a collateral attack on a
conviction or sentence such as this one.  "A prisoner has no
constitutional right to the assistance of counsel in connection
with petitions for post-conviction relief such as habeas corpus
or § 2255 relief."  <u>United States v. Doe</u>, 00 Cr. 782 (GEL), 2005
WL 167601 at *1 (S.D.N.Y. Jan. 25, 2005) (S.D.N.Y. 2005) (Lynch,

D.J.); <u>see also</u> <u>Wright v. West</u>, 505 U.S. 277, 293 (1992); <u>Penn-</u>
<u>sylvania v. Finley</u>, 481 U.S. 551, 555-59 (1987); <u>Heath v. United</u>
<u>States Parole Comm'n</u>, 788 F.2d 85, 88 (2d Cir. 1986); <u>Moolenaar</u>
<u>v. Mantella</u>, 00 Civ. 6380 (RMB)(KNF), 2001 WL 43602 at *1
(S.D.N.Y. Jan. 18, 2001) (K.N. Fox, M.J.).  Rather the appoint-
ment of counsel in such a proceeding is a matter of discretion.
The factors a court considers in deciding whether to exercise its
discretion to appoint counsel include "petitioner's likelihood of
success on the merits, the complexity of the legal issues raised
by the petition, and the petitioner's ability to investigate and
present the case [without counsel]."  <u>United States v. Doe</u>,
<u>supra</u>, 2005 WL 167601 at *1, <u>citing</u> <u>Toron v. United States</u>, 281
F. Supp. 2d 591, 593 (E.D.N.Y. 2003).

        Because the petition lacks merit, petitioner's applica-
tion for the appointment of counsel is denied.

            Courts do not perform a useful service if they appoint
            a volunteer lawyer to a case which a private lawyer
            would not take if it were brought to his or her atten-
            tion.  Nor do courts perform a socially justified
            function when they request the services of a volunteer
            lawyer for a meritless case that no lawyer would take
            were the plaintiff not indigent.

<u>Cooper v. A. Sargenti Co.</u>, 877 F.2d 170, 174 (2d Cir. 1989).

IV.  Conclusion

       For the foregoing reasons, I respectfully recommend that the petition be denied in all respects and that petitioner's request for a hearing and the appointment of counsel be denied.

       I further recommend that certification pursuant to 28 U.S.C. § 1915(a)(3) not be issued because any appeal from this Report and Recommendation, or any Order entered thereon, would not be taken in good faith.  See Coppedge v. United States, 369 U.S. 438, 445 (1962).

V.  OBJECTIONS

       Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections.  See also Fed.R.Civ.P. 6(a).  Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Jed S. Rakoff, United States District Judge, 500 Pearl Street, Room 1340, New York, New York 10007, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007.  Any requests for an extension of time for filing objec-tions must be directed to Judge Rakoff.  FAILURE TO OBJECT WITHIN

FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL**

PRECLUDE APPELLATE REVIEW.  <u>Thomas v. Arn</u>, 474 U.S. 140, 155

(1985); <u>United States v. Male Juvenile</u>, 121 F.3d 34, 38 (2d Cir.

1997); <u>IUE AFL-CIO Pension Fund v. Herrmann</u>, 9 F.3d 1049, 1054

(2d Cir. 1993); <u>Frank v. Johnson</u>, 968 F.2d 298, 300 (2d Cir.

1992); <u>Wesolek v. Canadair Ltd.</u>, 838 F.2d 55, 57-59 (2d Cir.

1988); <u>McCarthy v. Manson</u>, 714 F.2d 234, 237-238 (2d Cir. 1983).

Dated:  New York, New York
        August 20, 2015

                              Respectfully submitted,


                              HENRY PITMAN
                              United States Magistrate Judge


Copies mailed to:

Mr. Chaz Glynn
Reg. No. 49999-054
USP Allenwood
U.S. Penitentiary
P.O. Box 3000
White Deer, Pennsylvania  17887

Todd Blanche, Esq.
Assistant United States Attorney
Southern District of New York
One Saint Andrew's Plaza
New York, New York  10007